# UNITED STATES DISTRICT COURT

# DISTRICT OF ARIZONA

| UNITED STATES OF AMERICA | CRIMINAL COMPLAINT |
|---|---|
| V. | CASE NUMBER: 24-4142 MJ |
| Casey Trey Nodestine | |

I, the undersigned complainant, being duly sworn, state that the following is true and correct to the best of my knowledge and belief:

### Count 1

On or about May 12, 2024, in the District of Arizona, within the confines of the Navajo Nation Indian Reservation, Indian Country, the defendant, CASEY TREY NODESTINE, an Indian, in the commission of an unlawful act not amounting to a felony, and in the commission in an unlawful manner, and without due caution and circumspection, of a lawful act which might produce death, unlawfully killed victim E.G.H.

In violation of Title 18, United States Code, Sections 1153 and 1112.

### Count 2

On or about May 12, 2024, in the District of Arizona, within the confines of the Navajo Nation Indian Reservation, Indian Country, the defendant, CASEY TREY NODESTINE, an Indian, in the commission of an unlawful act not amounting to a felony, and in the commission in an unlawful manner, and without due caution and circumspection, of a lawful act which might produce death, unlawfully killed victim J.A.H.

In violation of Title 18, United States Code, Sections 1153 and 1112.

### Count 3

On or about May 12, 2024, in the District of Arizona, within the confines of the Navajo Nation Indian Reservation, Indian Country, the defendant, CASEY TREY NODESTINE, an Indian, in the commission of an unlawful act not amounting to a felony, and in the commission in an unlawful manner, and without due caution and circumspection, of a lawful act which might produce death, unlawfully killed victim M.C.M.

In violation of Title 18, United States Code, Sections 1153 and 1112.

I further state that I am a Special Agent of the Federal Bureau of Investigation and that this complaint is based on the following facts:

**See Attached Statement of Probable Cause Incorporated By Reference Herein.**

Continued on the attached sheet and made a part hereof: ☒ Yes ☐ No

AUTHORIZED BY: Dimitra H. Sampson, AUSA

| | |
|---|---|
| Erin Flickinger, Special Agent, FBI | ERIN FLICKINGER *(Digitally signed by ERIN FLICKINGER, Date: 2024.05.13 01:24:56 -07'00')* |
| Name of Complainant | Signature of Complainant |

Telephonically sworn

| | | |
|---|---|---|
| May 13, 2024 | At | Flagstaff, Arizona |
| Date | | City and State |
| HONORABLE CAMILLE D. BIBLES<br>United States Magistrate Judge | | Camille D. Bibles *(Digitally signed by Camille D. Bibles, Date: 2024.05.13 01:39:40 -07'00')* |
| Name & Title of Judicial Officer | | Signature of Judicial Officer |

## ELECTRONICALLY SUBMITTED AFFIDAVIT OF PROBABLE CAUSE

I, Special Agent Erin Flickinger, being duly sworn, state the following:

1. I, Erin Flickinger, am a Special Agent (SA) of the Federal Bureau of Investigation (FBI) and am currently assigned to the Flagstaff, Arizona Resident Agency. I have been employed with the FBI since April 2023. I am currently assigned to investigate violent crime in Indian Country, including homicide, sexual assaults, and aggravated assaults. I received training from the FBI in various aspects of law enforcement to include training in the investigative process of assault, homicide, and other violent crimes.

2. In the course of my official duties, I am charged with the investigation of crimes occurring on (among other places) the Navajo Nation Indian Reservation within the Federal District of Arizona. I am an investigative law enforcement officer of the United States, and I am empowered by law to conduct investigations and to make arrests for offenses enumerated in Title 18 of the United States Code.

3. The facts in this affidavit come from information obtained from other law enforcement agents and witnesses. This affidavit is intended to show only that there is sufficient probable cause for the requested complaint and does not set forth all of the FBI's knowledge about this matter.

4. This affidavit is made in support of a Criminal Complaint against CASEY TREY NODESTINE (NODESTINE), an Indian, alleging three counts of Involuntary Manslaughter, committed within the confines of the Navajo Nation Indian Reservation, in the District of Arizona, on or about May 12, 2024.

5. On May 12, 2024, at approximately 3:30 p.m., a vehicle crash occurred on US-89 at milepost 492. Two vehicles were involved, both occupied. The driver of the white Chevy Tahoe, NODESTINE, was injured. The driver and two of the passengers in the second vehicle were found deceased on scene. Two other passengers from the second vehicle were injured and evacuated to Tuba City Regional Health Care facility in Tuba City, Arizona. NODESTINE was driving a White Chevy Tahoe. The victims' vehicle was a silver Jeep Wrangler.

Drug Recognition Expert:

6. Arizona Department of Public Safety (AZ DPS) was requested to respond to the Tuba City Regional Health Care to evaluate NODESTINE. Trooper Anderson, Badge # 1141, a Drug Recognition Expert, responded to the request. Due to the subject lying in a hospital bed, a modified version of Standardized Field Sobriety Tests was conducted. When Trooper Anderson first contacted the NODESTINE, he noticed NODESTINE had slow slurred speech and bloodshot watery eyes. Trooper Anderson could also smell the odor of an alcoholic beverage emitting from NODESTINE's person.

7. Prior to administering the Horizontal Gaze Nystagmus (HGN) Test, Trooper Anderson asked NODESTINE if he wore contacts or glasses and he stated he wore hard contacts, and that was causing his eyes to be bloodshot. Trooper Anderson asked if NODESTINE had any head injuries and he stated he had prior concussions, with the last one being approximately three years earlier. He informed Trooper Anderson he does not have resting nystagmus, nor did Trooper Anderson observe resting nystagmus.

8. When Trooper Anderson administered the HGN, he observed lack of smooth pursuit in both eyes. In NODESTINE's right eye, Trooper Anderson observed distinct and sustained nystagmus at maximum deviation. Trooper Anderson did not observe any other clues. Trooper Anderson rechecked for maximum deviation from the other side of the hospital bed and did not observe it in either eye.

9. Trooper Anderson then checked for lack of convergence. NODESTINE's eye converged and then his left eye drifted slightly outwards. NODESTINE stated his eyes normally can cross.

10. Trooper Anderson then had NODESTINE performed a modified version of the Modified Romberg Balance while lying in the hospital bed. NODESTINE estimated the passage of thirty seconds in thirty-two seconds. When Trooper Anderson asked how much time had passed, he stated thirty seconds. NODESTINE stated he counted "Mississippi's." Trooper Anderson did not observe eyelid or body tremors.

11. Trooper Anderson could not have NODESTINE perform the Finger to Nose

2

due to him having an IV in his arm.

12. Trooper Anderson checked NODESTINE's vitals on the hospital monitor and observed NODESTINE's blood pressure had a systolic pressure of 111 mmHg and a diastolic pressure of 94 mmHg. His pulse was 105 Beats Per Minute (BPM). Based on Trooper Anderson's training and experience, he believed these readings (low systolic blood pressure and a high pulse) were consistent with NODESTINE being under the influence of a Central Nervous System Depressant (specifically, ETOH or alcohol).

13. Trooper Anderson asked NODESTINE if he could perform any other of the Standardized Field Sobriety Tests, and he stated he could not due to soreness.

14. Trooper Anderson had NODESTINE sit upright on the hospital bed and conducted the HGN test a second time, but from a different angle. Trooper Anderson observed lack of smooth pursuit in both eyes but no other clues. Trooper Anderson believed NODESTINE could have purposefully been looking past the stimulus (Trooper Anderson's pen). If a subject focuses on an item past the stimulus, nystagmus may not be visible.

### Interview of F.M.

15. On May 12, 2024, witness, F.M., was interviewed by the FBI. He is a family member to the victims and was traveling in a separate vehicle behind them on their way home from Antelope Canyon. According to F.M., a white SUV Tahoe was traveling northbound on US-89 toward Page, Arizona when the driver turned toward his lane's shoulder and then crossed over into the southbound lane hitting the silver Jeep Wrangler in front of F.M., driven by F.M.'s son, victim E.G.H. F.M. was the driver behind the silver Jeep Wrangler in a Ford F150, and he was able to brake in front of the crash. F.M. did not see the man in the white SUV Tahoe; F.M. was providing care to his family after the crash.

### Interview of H.Z.

16. On May 12, 2024, H.Z. was interviewed by the FBI. H.Z. was a passenger in the vehicle with F.M. H.Z. stated they were traveling behind their family in the silver Jeep Wrangler. H.Z. noticed a white Chevy SUV going in the opposite direction. The white Chevy SUV went off the road toward the shoulder then pulled back in, and struck the Jeep,

3

which flipped into the southbound ditch. The white SUV continued on a short distance and ended up pointing in the southbound lane behind them. H.Z. didn't see what happened to the driver of the white SUV.

### Interview of C.C.

17. On May 12, 2024, C.C. was interviewed by the FBI. C.C. was also a passenger in the vehicle with F.M. and H.Z. C.C. was talking with family members and his attention was primarily looking out the right front passenger window when H.Z. made an exclamation that caused him to look ahead. C.C. saw a white Chevy Tahoe impact the front of the Jeep Wrangler and the Jeep was thrown into the southbound shoulder. C.C. called 9-1-1. C.C. remembered the Tahoe horn continued to blare for several minutes after the crash. After the horn stopped blaring and after some time had passed, C.C. recalled seeing the driver of the Tahoe sitting outside his vehicle.

### Interview of H.M.

18. On May 12, 2024, H.M. was interviewed by the FBI. H.M. was also in the vehicle with F.M. H.Z., and C.C. H.M. was dozing off while everyone else was talking. C.C. was awakened by an exclamation from H.Z. and saw a white vehicle collide with the Jeep Wrangler. C.C. watched the Jeep break apart. F.M. parked near the Jeep and when she looked inside the Jeep, she saw her sister, victim J.A.H., in the back seat, leaned to the side, and she heard agonal breathing. C.C. also observed E.G.H., the driver, slumped over and making a gurgling noise. Victim M.C.M. was also in the backseat of the Jeep. C.C. checked M.C.M.'s pulse and could not feel one.

### Interview of D.D.

19. On May 12, 2024, a witness, D.D., was interviewed by AZ DPS. D.D. stated he was traveling northbound on US-89 when he was waved down by a girl at a pot sale stand. The girl told D.D. of a vehicle crash she heard. D.D. drove up to the scene to render support. D.D. performed immediate medical aid and chest compressions to a female and male victim who were in and near a ditch. Following medical aid, D.D. helped direct traffic around the vehicle crash scene. D.D. spoke with a witness to the accident (F.M.), who was

4

in a black pickup truck, and that individual said the Tahoe was driving erratically. That witness told D.D. that the driver said he was not the driver, despite a person who pulled the driver from the driver seat.

## Law Enforcement Observations at the Scene:

20. Law enforcement arrived on scene at 4:19 p.m. and observed a white Chevrolet Tahoe and a silver Jeep Wrangler on the right should of the southbound lanes. Tire friction marks were observed in the dirt shoulder on the northbound lanes and the asphalt of the northbound lanes which indicated the Tahoe ran off the roadway to the right, over-corrected across the northbound lane, and entered the southbound lane where it struck the Jeep Wrangler. While photographing the Tahoe, an empty glass whiskey bottle with no cap was discovered in the cupholder area of the front passenger door, and an empty "shooter" style bottle of alcohol was found on the ground next to the front right tire of the Tahoe. The driver seatbelt of the Tahoe was locked into an extended position and was the only seatbelt in the vehicle in such position.

## Tuba City Regional Health Care:

21. NODESTINE was taken to Tuba City Regional Health Care facility in Tuba City, Arizona, following the crash. As part of his treatment, medical staff drew NODESTINE's blood. The medical staff verbally informed the FBI that NODESTINE's blood alcohol content was .25 mg/dl.

## Jurisdiction:

22. The FBI confirmed that NODESTINE is an Indian and a member of the Navajo Nation. NODESTINE resides part time on the Navajo Nation with his mother while he looks for employment, and has a census number. He also receives healthcare treatment at Tuba City Regional Health Care, an Indian Health Services facility. The crash occurred on Highway 89, in Tuba City, Arizona, within the confines of the Navajo Nation, in the District of Arizona, in Indian Country.

## Conclusion

23. Based on the facts herein, I believe that there is probable cause to believe that

CASEY TREY NODESTINE, committed Involuntary Manslaughter, in violation of 18 U.S.C. §§ 1153 and 1112.

24. This Affidavit of Probable Cause was sworn telephonically before a United States Magistrate Judge legally authorized to administer an oath for this purpose.

25. **Pursuant to 28 U.S.C. § 1746(2), I declare under penalty of perjury that the foregoing is true and correct.**

_____  
Date

ERIN FLICKINGER  
Digitally signed by ERIN FLICKINGER  
Date: 2024.05.13 01:23:14 -07'00'

_____  
Erin Flickinger  
Special Agent, FBI

SWORN BY TELEPHONE

_____  
Date/Time

Camille D. Bibles  
Digitally signed by Camille D. Bibles  
Date: 2024.05.13 01:39:13 -07'00'

Honorable Camille D. Bibles  
United States Magistrate Judge

6